[Cite as *State v. Cook*, 2016-Ohio-2823.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Sheila G. Farmer, P.J. |
| Plaintiff-Appellee | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2015CA00090 |
| | : | |
| ANTHONY MARCELLE COOK | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Stark County Court of
Common Pleas, Case No. 2014CR1423

JUDGMENT:    AFFIRMED

DATE OF JUDGMENT ENTRY:    May 2, 2016

APPEARANCES:

For Plaintiff-Appellee:

JOHN D. FERRERO, JR.
STARK CO. PROSECUTOR
KATHLEEN O. TATARSKY
110 Central Plaza S., Ste. 510
Canton, OH 44702-1413

For Defendant-Appellant:

DEREK LOWRY
CRAWFORD LOWRY LLC
116 Cleveland Ave. NW
Canton, OH 44702-1732

*Delaney, J.*

{¶1}   Appellant Anthony Marcelle Cook appeals from the May 7, 2015 Judgment Entry of the Stark County Court of Common Pleas.  Appellee is the state of Ohio.

### FACTS AND PROCEDURAL HISTORY

*Dawn Remley goes on a Date with Ernest Morris*

{¶2}   Dawn Remley is an admitted crack cocaine addict, alcoholic, and prostitute. She has known Ernest Morris for approximately three years.  On August 20, 2014, around 5:00 p.m., she arranged to meet Morris near the Huntington Bank on West Tuscarawas Street in Canton, Ohio.  She and Morris shopped at a number of stores afterward, buying school supplies for Remley's children.  The two briefly returned to Morris' residence in Perry Township and Remley smoked crack cocaine.  Remley testified Morris was aware of her drug use but did not use drugs himself.

{¶3}   Next they delivered the school supplies to Remley's children at her mother's house.  They returned to Morris' house around 7:30 p.m.

{¶4}   Morris asked Remley whether she would go camping with him the next day. She agreed but said she needed to return to her apartment to pack clothing for the trip. Morris drove Remley to her Canton apartment in his red Ford Ranger pickup truck.  They arrived at the apartment around 10:30 p.m.

{¶5}   Earlier that day, before his date with Remley, Morris had picked up his truck from an auto body shop where it had been repaired.  Before the truck was returned to Morris, it was thoroughly detailed.

{¶6}   Remley lived in a brick apartment building near the intersection of Second Street and Fulton Road Northwest with her boyfriend, Richard Lowe.   Morris dropped

Remley off outside the apartment building and she went inside to get her things. In the meantime, she asked Morris to go to a drive-through carry-out to pick up alcohol and cigarettes. Morris was supposed to call her when he returned to the area.

{¶7} Morris owned a distinctive flip-style phone described as "chunky" with an orange battery pack attached to it. Remley testified she had used the phone to make several calls while they were together that day. She last saw the phone in the cup holder in the console of Morris' truck.

{¶8} Inside her apartment, Remley argued with Lowe because she had been gone longer than she expected. About thirty minutes later, Remley realized she had not heard from Morris. She decided to walk to the "Towne Manor" nearby to buy her own cigarettes from a vending machine. On her way back, she saw an ambulance and the lights of police cars in the parking lot behind her apartment building.

{¶9} Remley testified she did not know this police activity related to Morris until the next day when detectives knocked on her door.

*Robert Ingram, "Toby," Tells What He Knows*

{¶10} Ptl. Craig Riley is a Canton police officer familiar with the neighborhood surrounding the 900 block of West Tuscarawas Street. He described it as a low-income area known for prostitution and drug sales, a "hotbed for criminal activity." On August 14, he was dispatched to the area of Second and Moon Court N.W. for a report of a "man down" in a parking lot.

{¶11} Upon Riley's arrival on the scene, the 911 caller, a woman awaiting a bus, waved him down and pointed out the body of a man lying face-down next to a red truck in the parking lot. Riley observed people "meandering around" the area but no one near

the body.  Riley's first thought was to render first aid to the victim.  As he approached he realized the man was unconscious.  The pockets of the man's shorts were pulled inside out.  Riley started to roll the man over but observed blood beginning to pool in the face and realized he was deceased.  Riley observed apparent heavy blunt force trauma to the victim's face.

{¶12} Medics arrived and confirmed the victim was dead.  Police ran the license plate of the red truck and discovered the owner of the truck was the likely victim, Ernest Morris.  The victim matched the B.M.V. photo of Morris.

{¶13} Riley began to canvass the area for witnesses.  He encountered several people who said they didn't know anything.  On the corner of Fulton and Second, however, sitting on the steps of an apartment building, Riley made contact with Robert Ingram, known to the neighborhood as "Toby."  Riley was familiar with Ingram and described him as a petty criminal often found in the area.  Riley approached and asked if Ingram saw anything.  Ingram said no but winked at Riley.  Riley interpreted this to mean Ingram had information he didn't want to willingly share in front of others listening nearby.  Riley pretended to arrest Ingram and brought him to his patrol car.

{¶14} Ingram provided Riley with two names: "Tink" and "Jessica." Riley put out descriptions of these individuals to other officers.  He also learned "Charles Bishop" was a possible witness.

*Involvement of Jessica Bryant*

{¶15} Around 10:50 p.m. that evening, prior to the report of the homicide, an officer unwittingly made contact with Jessica Bryant. James Dereussi is a Canton police officer and was dispatched for a report of a fight between a man and a woman in the 200 block of Fulton Northwest on the night of the murder. As he approached the area, he observed a white female wearing a red skirt walking south on Fulton; the woman matched the description he had been given of the female involved in the fight. Dereussi stopped his patrol car in the middle of the street and called to the woman to ask if she was O.K.; she responded she was fine. Dereussi did not observe any injuries or "signs of distress" and allowed the woman to move on without asking her name.

{¶16} Dereussi later responded to the scene of the homicide and was given the names and descriptions of "Tink" and Jessica Bryant. He looked at a photo of Jessica Bryant and confirmed she was the woman in the red skirt he spoke to earlier.

{¶17} Dawn Remley testified she was familiar with Jessica Bryant as someone who frequented the area around Second and Fulton Northwest. Remley knew Bryant as a fellow prostitute and drug user. At the time of the murder, Bryant was dating appellant, who went by the street name "Tink."

*Testimony of Robert "Toby" Ingram*

{¶18} Robert Ingram testified reluctantly at trial. He acknowledged he knows Ptl. Riley and regularly hangs around the area of Second and Fulton Northwest. He acknowledged he is a drug user and a petty thief. Ingram knew appellant and Jessica Bryant to be "in a relationship" at the time of the murder.

{¶19} Ingram testified he saw both appellant and Bryant on the night of the murder between 10:30 and 11:15 p.m. Appellant was sitting on a porch with Ingram, drinking. Bryant walked by on the street. Shortly thereafter appellant left the porch. Ingram said he saw the lights of a vehicle pull up in the parking lot and saw "swinging" between someone outside the truck and someone inside the truck. Ingram stood up and watched briefly but didn't want to be involved.

{¶20} Soon after, an "old guy" came up and said there was a dead person in the parking lot so Ingram went to look at the body.

{¶21} Ingram acknowledged he signaled to Ptl. Riley that he had information about the murder although he was reluctant to make any unequivocal statement at trial. He acknowledged he told a detective that he watched the vehicle pull up in the parking lot, saw Jessica Bryant get out of it, and appellant walked by stating, "I think this motherfucker dead." Ingram also grudgingly agreed he "thinks" appellant was the person he observed in the parking lot with Ernest Morris and "thinks" he saw appellant strike Morris.

{¶22} Ingram didn't know "Tink's" real name is Anthony Cook although police confirmed the two had been in jail together.

*Appellant Talks to a Jailhouse Lawyer*

{¶23} Appellee called a witness named Steven Nunemaker who was incarcerated with appellant in the same housing unit in prison. Within that unit was a third prisoner who functioned as a "jailhouse lawyer," Peyton Hopson. Prisoners spoke to Hopson for advice on their cases.

{¶24} On or around November 6, 2014, Nunemaker went to speak to Hopson about a motion filed in his own case. Appellant was speaking with Hopson at the time and Nunemaker joined in the conversation as appellant detailed the events of the night of Morris's murder.

{¶25} Appellant said he was sitting on a porch on the corner of Fulton and Second Street Northwest, drinking beer, when a truck pulled up in front of the apartment building and dropped off Dawn Remley. The truck proceeded around to the parking lot in the rear of the building. A woman appellant was seeing at the time, Jessica Bryant, went to the truck and spoke to the driver. Appellant and some "acquaintances" then approached the truck. One of these acquaintances was "Chuck," who reached into the window of the truck and removed the keys.

{¶26} Appellant got into an argument with Bryant which became "heated" and the driver of the truck got involved. The driver exited the truck and was assaulted by appellant and his acquaintances. Nunemaker testified appellant said the driver "fell like a seal," face forward onto the ground.

{¶27} Nunemaker said appellant was shadowboxing and simulating the fight scene as he described the events in prison to Nunemaker and Hopson. After the assault, he said he and Bryant left the scene in different directions. Appellant went to see someone named "Andre" to provide an alibi.

{¶28} Nunemaker testified appellant told of disposing of the victim's cell phone: an "orange piece of shit." Hopson asked if anyone could identify appellant and he said "Toby" and "Bishop."

{¶29} Hopson was confused about appellant's description of where the events occurred so appellant drew a map of the neighborhood. Nunemaker recreated this map at trial as appellee's exhibit 39. The drawing included, e.g., the location of the apartment, "Toby," the truck, and the body of the victim.

{¶30} Nunemaker testified he is from Wayne County and is not familiar with Canton. He said his knowledge of the crime scene came entirely from the conversation with appellant and Hopson.

*Physical Evidence: Appellant's Handprint on Truck*

{¶31} The recently-detailed surface of Morris' truck revealed prints to evidence technicians who collected lifts from the outside driver's-side door area. The handprint bisected both sides of the line of the door; in other words, the hand had rested against the door when it was closed. The handprint was identified as appellant's.

{¶32} Other lifts were taken from the inside of the passenger window. These fingerprints were identified as Dawn Remley's.

{¶33} Evidence technicians also found a condom, still in the wrapper, under the driver's-side door of the truck near the side of the victim, "as if it fell out of the truck." Morris' keys and wallet were found separately, some distance away from the truck.

{¶34} A cigarette pack containing a crack pipe was found inside the passenger's door of the truck. Remley identified the cigarettes and crack pipe as hers.

*Indictment, Trial, and Conviction*

{¶35} On August 22, 2014, appellant was arrested upon a single count of misdemeanor obstruction of official business pursuant to R.C. 2921.31 and was committed to the Stark County Jail in lieu of bond. On August 29, 2014, charges of

aggravated murder [R.C. 2903.01] and aggravated robbery [R.C. 2911.01(A)(3)] were filed by criminal complaint in the Canton Municipal Court. The cases were consolidated and proceeded to preliminary hearing in the municipal court on September 8, 2014. The municipal court found probable cause to bind over the felony counts to the Stark County Grand Jury. Appellant remained incarcerated.

{¶36} Appellant was charged by indictment on November 3, 2014 with one count of murder pursuant to R.C. 2903.02(B) and one count of aggravated robbery pursuant to R.C. 2911.01(A)(3).

{¶37} On November 13, 2014, a superseding indictment was filed charging appellant with one count of murder pursuant to R.C. 2903.02(B) [Count I]; one count of felonious assault pursuant to R.C. 2903.11(A)(1), a felony of the second degree [Count II]; and one count of aggravated robbery pursuant to R.C. 2911.01(A)(3), a felony of the first degree [Count III]. All three counts include repeat violent offender specifications pursuant to R.C. 2941.149.

{¶38} On November 17, 2014, appellant refused to sign a Judgment Entry stating the trial court had appointed Attorney Wayne Graham to represent him but appellant knowingly and voluntarily waived the right to counsel and would proceed pro se.

{¶39} Also on November 17, 2014, the trial court issued a Judgment Entry stating the court sua sponte extended the trial date beyond the statutory time limits. The trial court acknowledged the try-by date was November 22. The trial court described the procedural history of the case stating neither party was in receipt of all discovery necessary for trial; appellant was not prepared to represent himself pro se; the superseding indictment had been filed three days before; appellant refused to sign a time

waiver; and appellant continued to reject the assistance of shadow counsel appointed by the trial court. Thus, pursuant to R.C. 2945.72(H), the trial court found the statutory time limits to be tolled for a sua sponte continuance "other than on the accused's own motion" because:

> * * * *.

> To arraign [appellant] on felony charges on a Friday and then require him to represent himself at trial on the following Monday, when he faces a possible life sentence, would be the ultimate miscarriage of justice and a mockery of the criminal justice system. In balancing all the parties' interests and the Statutes and Criminal Rules, the Court finds it is reasonable to grant a short continuance of the trial in this matter and hereby continues it to the 16th day of December, 2014 at 9:00 a.m. with another pretrial December 1, 2014 at 9:00 a.m.

> * * * *.

{¶40} On November 18, 2014, appellant filed a pro se "Request for Eyewitness" requesting a subpoena to Jessica Bryant at the Stark County Jail and also a "Request for Alibi" stating he was at the home of Andre Horner, asleep on the couch, when the crimes occurred. Appellant also filed a pro se Request for Discovery and Request for Bill of Particulars, and a "Motion to Change Venue."

{¶41} On November 20, 2014, the trial court filed a Judgment Entry memorializing a pretrial held on November 18, noting appellant still refused to sign a time waiver and still intended to proceed pro se:

> * * * *.

> With statutory time limits now stayed due to the demand for discovery, the Court ordered the State of Ohio to provide any and all discovery to [appellant] by Monday, December 15, 2014. However, the trial, which the Court contemplated starting on the afternoon of Nov. 19th would then need to be entirely continued to December 16, 2014 at 9:00 a.m., the date previously set.
>
> * * * *.

{¶42} On December 3, 2014, appellee filed a Request for Competency Evaluation.

{¶43} On December 3, 2014, appellant filed a pro se Motion to Dismiss.

{¶44} On December 10, 2014, the trial court filed an Order Directing the Evaluation of Defendant's Competence to Stand Trial. In a separate Judgment Entry filed December 16, 2014, the trial court recounted the procedural history of the case and the reasons for the sua sponte continuance of the trial date. The court further stated:

> * * * *.
>
> At the December 1, 2014 pre-trial, the State of Ohio raised the issue of [appellant's] competency to stand trial; the Court expressed its own concern. R.C. 2945.37 states in part: (B) in a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of Defendant's competence to stand trial…
>
> The Court engaged in dialogue with [appellant], which raised more suspicion of his competency. [Appellant] acknowledged that in the past he had received some type of counseling at the Crisis Center. When the Court

made further inquiry, [appellant] refused to provide any additional information. [Appellant] admitted that he was currently taking a drug, but refused to answer any of the Court's questions when asked what type of drug. [Appellant] advised the Court that the Court's questions were "irrelevant."

* * * *.

{¶45} The trial court thereupon ordered appellant to undergo a competency evaluation and advised a hearing would be scheduled within ten days of receiving the report of the evaluation.

{¶46} On December 31, 2014, appellee filed a Motion to Amend Indictment to add aiding and/or abetting language to Counts I, II, and III and appellant filed a motion in opposition. The trial court granted the motion on January 2, 2015.

{¶47} A competency hearing was scheduled for January 20, 2015.

{¶48} On January 21, 2015, the trial court appointed Attorney Wayne Graham to represent appellant. On that date, appellant also signed a time waiver.

{¶49} On February 11, 2015, the trial court entered a Judgment Entry noting the parties stipulated to the report of Dr. Arcangela Wood dated January 12, 2015, stating it is her professional opinion, based on a reasonable degree of psychological certainty, appellant understood the nature and objectives of the proceeding against him and had the capacity to assist counsel in his own defense or to proceed pro se. The trial court therefore found appellant to be competent but in light of the trial scheduled for the next day, appointed Attorney Wayne Graham to represent appellant. Appellant thereupon signed the time waiver. On February 9, however, Attorney Graham advised the court he

could not represent appellant due to "irreconcilable differences" including appellant's encouragement to violate ethical canons in the process of representing him. Attorney Graham was permitted to withdraw and the trial court appointed Attorney Jacob Will to represent appellant at trial, with appellant's consent.

{¶50} The matter eventually proceeded to trial by jury beginning March 16, 2015. The repeat-violent-offender specifications were bifurcated and trial separately to the court. Appellant moved for judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence and at the close of all of the evidence; the motions were overruled. Appellant was found guilty upon Counts I and II, murder and felonious assault, and not guilty upon Count III, aggravated robbery. The trial court found appellant guilty upon the accompanying R.V.O. specifications. Counts I and II merged for sentencing and the trial court imposed a prison term of 15 years to life.

{¶51} Appellant now appeals from the May 7, 2015 Judgment Entry of the trial court.

{¶52} Appellant raises nine assignments of error:

**ASSIGNMENTS OF ERROR**

{¶53} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING A COMPETENCY EVALUATION OF APPELLANT."

{¶54} "II. THE TRIAL COURT DENIED APPELLANT HIS RIGHT TO A SPEEDY TRIAL."

{¶55} "III. THE TRIAL COURT DENIED APPELLANT HIS RIGHT TO SELF REPRESENTATION."

{¶56} "IV.    THE TRIAL COURT ERRED IN ALLOWING THE STATE TO IMPEACH ITS OWN WITNESS."

{¶57} "V.    THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO PREJUDICIAL INTERVENTION BY THE TRIAL COURT."

{¶58} "VI.    THE TRIAL COURT ERRED IN PREVENTING APPELLANT'S COUNSEL FROM QUESTIONING [A] STATE'S WITNESS ABOUT WHETHER HE WAS GIVEN A REDUCED SENTENCE IN RETURN FOR HIS TESTIMONY."

{¶59} "VII.    THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."

{¶60} "VIII.    THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASISTANCE OF COUNSEL."

{¶61} "IX.    THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

## ANALYSIS

### I.

{¶62} In his first assignment of error, appellant argues the trial court abused its discretion in ordering a competency evaluation.  We disagree.

{¶63} We review the decisions of the trial court regarding competency evaluations for an abuse of discretion.  See, *State v. Dye*, 5th Dist. Licking No. 99-CA-2, 1999 WL 770619, *2 (Sept. 2, 1999).  In order to find that the trial court abused its discretion, we must find that the trial court's decision was unreasonable, arbitrary or unconscionable and

not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶64} The issue of appellant's competency arose before trial.  We therefore look to R.C. 2945.37(B), which states in pertinent part: "In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. **If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section.** If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion. (Emphasis added.)"  In interpreting this language, the courts of this state have held that a hearing is mandatory under these circumstances. *State v. Bailey*, 90 Ohio App.3d 58, 66, 627 N.E.2d 1078 (11th Dist.1992), citing *State v. Rubenstein*, 40 Ohio App.3d 57, 531 N.E.2d 732 (8th Dist.1987).

{¶65} Appellant argues the trial court abused its discretion in ordering the competency evaluation, the inverse of the argument usually raised regarding competency decisions.  In this case, appellant infers the competency review was a means for the trial court to avoid the speedy-trial requirements, an argument which will be addressed infra.

{¶66} We find, though, the trial court did not abuse its discretion in ordering the competency evaluation.  Appellant cites factors from *Rubenstein*, supra, 40 Ohio App.3d at 60.  That case involved a trial court's decision to evaluate the competency of the defendant during trial, wherein the trial court must hold a hearing only "upon good cause shown."  R.C. 2945.37(B).  Although no general standard exists to measure the nature or quantum of evidence necessary to merit a *sua sponte* hearing on an accused's

competence to stand trial, relevant considerations include: (1) doubts expressed by counsel as to the defendant's competence; (2) evidence of irrational behavior; (3) the defendant's demeanor at trial; and (4) prior medical opinion relating to competence to stand trial. *Rubenstein*, supra, 40 Ohio App.3d at 60-61, internal citation omitted.

{¶67} The instant case differs from *Rubenstein* because the trial court was required to hold a hearing. We begin with the rebuttable presumption that a defendant is competent to stand trial. R.C. 2945.37(G); *State v. Barton,* 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 56. This presumption remains valid under R.C. 2945.37(G) unless, "after a hearing, the court finds by a preponderance of the evidence" that the defendant is not competent. *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 74.

{¶68} Questions of an accused's competency invoke constitutional concerns. "The right to a hearing 'rises to the level of a constitutional guarantee where the record contains "sufficient indicia of incompetence," such that an inquiry * * * is necessary to ensure the defendant's right to a fair trial.'" *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 160, citing *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 156, internal citations omitted. And "[i]ncompetency is defined in Ohio as the defendant's inability to understand ' * * * the nature and objective of the proceedings against him or of presently assisting in his defense.'" Id., citing *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986), quoting R.C. 2945.37(A).

{¶69} The record before us indicates that at arraignment upon the superseding indictment on November 14, 2014, in reply to the trial court's questions about his plans to represent himself, appellant said he was on anxiety medications in jail and had a "nervous

breakdown" in 2008 although he was never institutionalized. Appellee then questioned appellant's competence, noting appellant did not believe what his court-appointed attorney was reporting to him; didn't know the specific medications he was on; was convinced of a conspiracy by the police; and had not made "rational decisions" regarding his defense since the inception of the case. We find these factors combined with appellant's own responses to the trial court about his mental health issues support the trial court's decision to seek a competency evaluation. Reviewing these decisions, the Ohio Supreme Court has noted "in such matters, we defer to those 'who see and hear what goes on in the courtroom.'" *Johnson*, supra, 2006-Ohio-6404 at ¶ 162, citing *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999).

{¶70} Under these circumstances, in which the record contains "sufficient indicia of incompetence," if the trial court had failed to inquire into appellant's competency it may have violated appellant's right to a fair trial. *Johnson*, supra, 2006-Ohio-6404 at ¶ 160.

{¶71} The trial court did not abuse its discretion and appellant's first assignment of error is overruled.

II.

{¶72} In his second assignment of error, appellant argues the trial court denied his right to a speedy trial because the competency evaluation was tolled against appellant. We disagree.

{¶73} Speedy trial provisions are mandatory and are encompassed within the Sixth Amendment to the United States Constitution. The availability of a speedy trial to a person accused of a crime is a fundamental right made obligatory on the states through the Fourteenth Amendment. *State v. Ladd,* 56 Ohio St.2d 197, 200, 383 N.E.2d 579

(1978); *State v. Pachay,* 64 Ohio St.2d 218, 219, 416 N.E.2d 589 (1980). Our review of a trial court's decision regarding a motion to dismiss based upon a violation of the speedy trial provisions involves a mixed question of law and fact. *State v. Larkin,* 5th Dist. Richland No. 2004–CA–103, 2005–Ohio–3122, ¶ 11. Due deference must be given to the trial court's findings of fact if supported by competent, credible evidence. Id. However, we must independently review whether the trial court properly applied the law to the facts of the case. Id*.* Furthermore, when reviewing the legal issues presented in a speedy trial claim, an appellate court must strictly construe the relevant statutes against the state. *Brecksville v. Cook,* 75 Ohio St.3d 53, 57, 1996–Ohio–171, 661 N.E.2d 706.

{¶74} A person charged with a felony must be brought to trial within 270 days unless the right to a speedy trial is waived. R.C. 2945.71(D)(2). If a person is held in jail in lieu of bond, then each day that the suspect is in custody counts as three days. R.C. 2945.71(E). Pursuant to R.C. 2945.73, a person who is not brought to trial within the proscribed time periods found in R.C. 2945.71 and R.C. 2945.72 "shall be discharged" and further criminal proceedings based on the same conduct are barred. "When reviewing a speedy-trial issue, an appellate court must calculate the number of days chargeable to either party and determine whether the appellant was properly brought to trial within the time limits set forth in R.C. 2945.71." *State v. Riley,* 162 Ohio App.3d 730, 2005–Ohio–4337, 834 N.E.2d 887, ¶ 19 (12th Dist.).

{¶75} Certain events toll the accumulation of speedy-trial time. R.C. 2945.72 states in pertinent part:

The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:

* * * *.

(B) Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;

(C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;

* * * *.

(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

* * * *.

(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion;

* * * *.

{¶76} Appellant challenges the tolling of time upon the trial court's decision to order a competency evaluation. We are required to calculate the number of days chargeable to each party, however, thus we revisit the procedural history of the case.

{¶77} The relevant date of arrest is August 22, 2014. Pursuant to R.C. 2945.71(C)(2), appellee had 270 days to try appellant, subject to the triple-count provision of 2945.71(E). Appellant remained incarcerated throughout the proceedings.

{¶78} The first tolling event occurred on November 17, 2014: the trial court issued a judgment entry sua sponte extending time beyond the statutory limits. Pursuant to R.C. 2945.72(H), any reasonable continuance granted other than upon the accused's own motion may extend speedy-trial time; here, the trial court acknowledged the recent filing of the superseding indictment, appellant's rejection of shadow trial counsel, and the fact that neither party was in possession of all discovery in the case. The trial court extended the trial date to December 16, 2014.

{¶79} When sua sponte granting a continuance under R.C. 2945.72(H), the trial court must enter the order of continuance and the reasons therefor by journal entry prior to the expiration of the time limit prescribed in R.C. 2945.71 for bringing a defendant to trial. *State v. Mincy*, 2 Ohio St.3d 6, 441 N.E.2d 571 (1982), syllabus. The trial court complied with *Mincy*.[1]

---

[1] On November 18, 2014, appellant filed a number of pro se motions, including a "Request for Eyewitness," demands for discovery and a bill of particulars, and a motion to change venue. Time could therefore have been tolled pursuant to R.C. 2945.72(E), "[a]ny period of delay necessitated by reason of a * * * motion, instituted by the accused."

{¶80} In the meantime, appellee filed the Request for Competency Evaluation on December 3, 2014, tolling time until the date of the competency hearing scheduled for January 20, 2015. On January 21, 2015, appellant signed a time waiver.

{¶81} We find the total amount of days chargeable to appellee to be 261 [the time between arrest and the trial court's sua sponte continuance] plus 3 [one day between the scheduled competency hearing and appellant's time waiver], or 264 total days. Appellant's speedy-trial rights were not violated.

{¶82} Appellant argues, however, that because the competency evaluation should not have been ordered, the duration of its pendency should be charged to appellee. As we have noted, other tolling events occurred during that time, but we reject appellant's argument regarding the effect of the filing of the motion for competency evaluation. The express language of R.C. 2945.72(B) is broadly worded to include any period in which the accused's mental competency is being determined. *State v. Palmer*, 84 Ohio St.3d 103, 106, 1998-Ohio-507, 702 N.E.2d 72 (1998). When a motion is filed for a competency evaluation, the trial court is on notice that competency is at issue. Id. It is when the competency motion is filed that the tolling provision of R.C. 2945.72(B) comes into play. Id. Pursuant to R.C. 2945.72(B), the time within which an accused must be brought to trial is tolled from the date of filing a motion challenging the accused's competency to stand trial. Id.

{¶83} Appellant fully acknowledges the effect of the filing of a motion for competency upon the time limits for trial, but argues the trial court abused its discretion in ordering the competency evaluation and therefore time should not have been tolled. Appellant acknowledges if the trial court did not abuse its discretion in ordering a mental

health evaluation, "the speedy-trial provisions of R.C. 2945.71 were properly tolled pending such evaluation pursuant to R.C. 2945.72(B)." *State v. Patton*, 10th Dist. Franklin No. 08AP-800, 2009-Ohio-1382, ¶ 10.

{¶84} We determined supra the trial court did not abuse its discretion in ordering the competency evaluation. The speedy-trial time was thus properly tolled pursuant to R.C. 2945.72(B). *Patton*, supra, 2009-Ohio-1382 at ¶ 10.

{¶85} Appellant's speedy-trial rights were not violated and his second assignment of error is overruled.

III.

{¶86} In his third assignment of error, appellant argues the trial court denied his right to self-representation. We disagree.

{¶87} The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provides that a criminal defendant has a right to counsel. Crim.R. 44(A) provides that a defendant is entitled to counsel "unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently, and voluntarily waives his right to counsel."

{¶88} A criminal defendant also has the constitutional right to waive counsel and to represent himself at trial. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, "the Constitution * * * require[s] that any waiver of the right to counsel be knowing, voluntary, and intelligent * * *." *Iowa v. Tovar,* 541 U.S. 77, 87–88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004). "In order to establish an effective waiver of [the] right to counsel, the trial court must make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right." *State v. Gibson,* 45

Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph two of the syllabus. The defendant must make an intelligent and voluntary waiver with the knowledge he will have to represent himself, and that there are dangers inherent in self-representation. *State v. Ebersole,* 107 Ohio App.3d 288, 293, 668 N.E.2d 934 (3rd Dist.1995), citing *Faretta,* supra.

{¶89} In *Gibson,* the Ohio Supreme Court applied the test set forth in *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), which established the requirements for a sufficient pretrial inquiry by the trial court into a waiver of counsel:

> To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

> *State v. Gibson,* 45 Ohio St.2d 366, 377, 345 N.E.2d 399 (1976).

{¶90} In the instant case, appellant initially rejected counsel and the record reveals the trial court met and exceeded the minimum standard required for accepting a valid waiver of counsel. See, *State v. Gibson*, 5th Dist. Stark No. 2013CA00175, 2014-Ohio-1169, ¶ 24, appeal not allowed*,* 140 Ohio St.3d 1418, 2014-Ohio-3785, 15 N.E.3d 885.  Appellant subsequently revoked that waiver, however, by accepting court-appointed counsel twice.

{¶91} Appellant argues he should have been permitted to represent himself, but as appellee points out, by the time of trial appellant did not seek to proceed pro se. Nor was counsel forced upon him. Appellant agreed to the appointment first of Attorney Wayne Graham and later Attorney Jacob Will. Will represented appellant at trial. Appellant argues he should have been permitted to represent himself, but the record does not establish he sought to do so. At the pretrial on January 20, 2015, on the record, appellant stated he intended to be represented by Graham. (T. 10). Graham later withdrew with permission of the trial court, at which time Will was appointed. At the final pretrial hearing on March 2, 2015, appellant stated he was satisfied with Will's representation and the trial court advised the trial would thus begin on March 16. (T. 4). We are unable to find that appellant voluntarily, knowingly, and intelligently elected to represent himself because the record establishes his acceptance of court-appointed counsel.

{¶92} Our conclusion is in accord with the recent decision of the Ohio Supreme Court finding if the record definitively demonstrates a defendant abandoned his request to represent himself, as it does here, there is no violation of the Sixth Amendment right to self-representation. See, *State v. Obermiller*, __Ohio St.3d__, 2016-Ohio-1594, __N.E.3d__.

{¶93} Appellant's third assignment of error is overruled.

IV.

{¶94} In his fourth assignment of error, appellant argues the trial court erred in permitting appellee to impeach its own witness, Robert "Toby" Ingram, with use of Ingram's prior inconsistent statement. We disagree.

{¶95} Upon motion by appellee, Ingram was declared a material witness, was taken into custody, and appeared in court as a reluctant witness. Appellant states summarily that appellee's "method of impeaching Mr. Ingram and the method used to refresh his recollection were incorrect and constitute error," but no prior statement was introduced into evidence.

{¶96} As we will note repeatedly throughout this opinion, appellant does not support his argument with reference to specific portions of the record, a violation of App.R. 12(A)(2). Nonetheless, in the interest of justice and because we would rather determine this case upon the merits, we have reviewed Ingram's testimony and find he was not confronted with any prior inconsistent statement.

{¶97} At trial, Ingram first testified appellant did not say anything to him on the night of the murder. The prosecutor then repeatedly asked Ingram if he was sure about that and pressed him, asking whether he remembered what he told prosecutors and detectives. Ingram was never confronted with any prior statements. Instead, he finally testified he told Sgt. Prince, an investigator, that he saw Morris' vehicle pull up, Bryant got out, and appellant walked past him stating "I think this mother fucker dead." (T. II, 165).

{¶98} Appellant argues this statement violated Ohio Evid. R. 607(A), stating in pertinent part: "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." We note Ohio Evid. R. 611 states in pertinent part:

(A) Control by Court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

* * * *.

(C) Leading Questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

{¶99} "When a witness demonstrates hostility during his examination by changing his testimony significantly from that which counsel has good reason to expect, he [is] traditionally subject to leading questions." *State v. Liston*, 11th Dist. Portage No. 98-P-0039, 1999 WL 778377, *4-5 (Sept. 24, 1999), citing *State v. Stearns,* 7 Ohio App.3d 11, 14, 454 N.E.2d 139 (8th Dist.1982) and *State v. Springer*, 165 Ohio St. 182, 134 N.E.2d 150 (1956).

{¶100}     In the instant case, we note appellant did not invoke Evid.R. 607 at trial; no objection was raised throughout Ingram's direct testimony described above.  A decision as to whether a party may pose leading questions on direct examination is left to the sound discretion of the trial court. *Ramage v. Cent. Ohio Emergency Services, Inc.*,

64 Ohio St.3d 97, 111, 592 N.E.2d 828 (1992). Ordinarily, a trial judge is in a better position to evaluate the attitudes displayed by witnesses. *Stearns*, supra, 7 Ohio App.3d at 14. Absent an abuse of discretion, such a decision will not be overturned on appeal. *Ramage* at 111, 592 N.E.2d 828.

{¶101} As the Staff Notes to Evid.R. 607 indicate, the reason for retaining the requirement that a party demonstrate surprise and affirmative damage before the party can impeach its own witness with prior inconsistent statements of that witness is to prevent that party from calling "a known adverse witness simply for the purpose of getting a prior inconsistent statement into evidence by way of impeachment, thus doing indirectly what it could not have done directly." *State v. Warren*, 67 Ohio App.3d 789, 798, 588 N.E.2d 905, 911 (6th Dist.1990). There is no indication of any such motivation in the instant case. Ingram was a reluctant witness from the moment he winked at Ptl. Riley on the porch steps; at trial, he eventually reiterated his statement to investigators without requiring confrontation by any prior inconsistent statement.

{¶102} Appellant's fourth assignment of error is overruled.

V.

{¶103} In his fifth assignment of error, appellant argues he was denied a fair trial by "prejudicial intervention" of the trial court on behalf of appellee. We disagree.

{¶104} Appellant refers to two instances of alleged intervention by the trial court revealing prejudice in favor of appellee: 1) after the coroner's direct testimony concluded, the trial court asked whether his answers were made with a reasonable degree of medical certainty, and 2) "[a]t points in the Trial where the Court should have

acted to stop the Prosecutor from engaging in improper questioning, the Court remained silent."

{¶105}     With regard to appellant's first cited example, we have reviewed the record of the entire trial and fail to comprehend how clarification of the coroner's opinion is prejudicial or beneficial to either party.  The witness testified as an expert as to the cause of death, a matter which was not in dispute, and the trial court's question merely clarified the basis of the testimony.

{¶106}     Regarding appellant's second argument, we decline to search the record for examples of the trial court failing to "stop…improper questioning."  This court is not required to search the record for evidence to support appellant's claims. *Bd. of Trustees of Chester Tp. v. Baumgardner*, 11th Dist. Geauga No. 2002-G-2430, 2003-Ohio-4361, ¶ 9, citing *Pearn v. DaimlerChrysler Corp.,* 148 Ohio App.3d 228, 2002–Ohio–3197*,* ¶ 35 (9th Dist.).  Appellee acknowledges the prosecutor asked leading questions of Robert Ingram as we discussed supra in assignment of error IV., but we have already noted no objection was raised and permitting the line of questioning without sua sponte intervention was not an abuse of the trial court's discretion.

{¶107}     Appellant's fifth assignment of error is overruled.

VI.

{¶108}     In his sixth assignment of error, appellant argues the trial court improperly prevented defense trial counsel from questioning Nunemaker about whether his sentence was reduced in exchange for his testimony.  We disagree.

{¶109}     Again, we note appellant fails to support his argument with reference to any specific location in the record.  App.R. 12(A)(2).  Nonetheless, our review of the

record of the cross-examination of Nunemaker reveals defense trial counsel extracted testimony that he was convicted upon a charge of felonious assault and received a prison term of four years.  When defense trial counsel asked if Nunemaker knew the range of potential sentences for the offense of felonious assault, appellee objected and the trial court sustained the objection, instructing defense trial counsel, "* * * [W]hat's the point he got four years?  If you're trying to say he got a deal for the four years, then I would bring it out that way."  (T. II, 220).  Defense trial counsel thereupon questioned Nunemaker about the timing of his revelations about appellant's admissions in prison, which were made to the prosecutor's office shortly after Nunemaker entered his no-contest plea to the felonious assault charge.

{¶110}      The admission or exclusion of relevant evidence is a matter left to the sound discretion of the trial court.  Absent an abuse of discretion resulting in material prejudice to the defendant, a reviewing court should be reluctant to interfere with a trial court's decision in this regard.  *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶111}      We find no material prejudice resulting to appellant from the questioning above.  Appellant's point was to impeach Nunemaker's credibility by showing his motive to falsify his testimony to work a better deal with respect to his own prison term.  There is no evidence, however, that the witness received a more favorable sentence in exchange for his testimony.

{¶112}      Appellant's sixth assignment of error is overruled.

VII.

{¶113}    In his seventh assignment of error, appellant argues he was prejudiced by multiple instances of prosecutorial misconduct.  We disagree.

{¶114}    The test for prosecutorial misconduct is whether the prosecutor's remarks and comments were improper and if so, whether those remarks and comments prejudicially affected the substantial rights of the accused. *State v. Lott,* 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), cert. denied, 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596 (1990). In reviewing allegations of prosecutorial misconduct, we must review the complained-of conduct in the context of the entire trial. *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived appellant of a fair trial based on the entire record. *Lott,* supra, 51 Ohio St.3d at 166, 555 N.E.2d 293.

{¶115}    First, appellant cites instances of alleged improper questioning we have addressed supra, including leading questions of Ingram and Nunemaker and the impeachment of Ingram.  Appellant also cites the prosecutor's purported vouching for Nunemaker when she asked him whether he came forward because he "felt it was the right thing to do."  An attorney may not express a personal belief or opinion as to the credibility of a witness. *State v. Davis,* 116 Ohio St.3d 404, 2008–Ohio–2, 880 N.E.2d 31, ¶ 232. Improper "vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." Id*., citing *State v. Jackson*, 107 Ohio St.3d 53, 2005–Ohio–5981, 836 N.E.2d 1173, ¶ 117.  As appellee points out, this "vouching" was a restatement of Nunemaker's testimony.  While the cited comments

may have been improper, we find no prejudicial effect to appellant in the context of the entire trial.

{¶116}     Appellant also points to a number of statements during closing argument but fails to demonstrate prejudice based upon any of the prosecutor's comments he cites. "Appellant does not identify any connection between the alleged misconduct and his conviction. * * * *. [T]he trial court clearly believed, and the record reflects, that the prosecutor's theory of the case was relevant as to certain issues. Appellant's pure speculation as to how the jury might overreact to this evidence is not the kind of 'but for' argument that will support a finding of misconduct." *State v. Meeks*, 5th Dist. No. 2014CA00017, 2015-Ohio-1527, 34 N.E.3d 382, 400-01, ¶ 105, appeal not allowed*, 143 Ohio St.3d 1543, 2015-Ohio-4633, 40 N.E.3d 1180, citing *State v. Carmichael,* 7th Dist. Columbiana No. 11 CO 23, 2013-Ohio-2178, 2013 WL 2325849, ¶ 14. None of the evidence or arguments cited by appellant are improper, and appellant cannot demonstrate, even if they were improper, "but for" the evidence and arguments he would not have been convicted. Having failed to demonstrate a causal connection between the alleged misconduct and his resulting convictions, appellant cannot demonstrate reversible error.

{¶117}     Appellant's seventh assignment of error is overruled.

VIII.

{¶118}     In his eighth assignment of error, appellant argues he received ineffective assistance of trial counsel due to failure to object to appellee's leading questions. We disagree.

{¶119}     To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶120}     "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶121}     Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶122}     Appellant equates this case with *State v. Howard*, which we find to be inapposite. In that case, we determined serious misconduct of the prosecutor shifted the burden of proof to the defendant and invaded the province of the jury as to opinions of the credibility of the witnesses, thus rising to the level of plain error. *State v. Howard*, 5th Dist. Stark No. 2002CA00333, 2003-Ohio-2804, ¶ 55. Appellant has demonstrated no such misconduct in the instant case, much less pointed to any prejudicial effect.

{¶123}     Appellant also asserts the cumulative effect of the errors denied him a fair trial.  In *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), the Ohio Supreme Court held pursuant to the cumulative error doctrine "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." Regarding appellant's argued ineffective assistance, we do not find multiple instances of harmless error triggering the cumulative error doctrine. *State v. Scott,* 5th Dist. Richland No. 11CA80, 2012–Ohio-3482, ¶ 76, appeal not allowed, 133 Ohio St.3d 1491, 2012–Ohio–5459, 978 N.E.2d 910.

{¶124}     Appellant's eighth assignment of error is overruled.

IX.

{¶125}     In his ninth assignment of error, appellant argues his convictions upon one count of murder and one count of felonious assault are against the manifest weight and sufficiency of the evidence.  We disagree.

{¶126}     The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus.  The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶127}    In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387.   Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶128}    Appellant was found guilty of one count of murder pursuant to R.C. 2903.02(B), which states, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."   He was also found guilty upon one count of felonious assault pursuant to R.C. 2903.11(A)(1), a felony of the second degree, which states in pertinent part, "No person shall knowingly * * * [c]ause serious physical harm to another * * *."

{¶129}    Appellant argues the evidence does not support his convictions because police found no blood or D.N.A. on his clothing.  Appellant told police he changed his clothes between the time of the murder and when police found him.  Appellant also points to the lack of "foreign blood or D.N.A." in the victim's truck, but there was no

evidence the crime occurred inside the truck. Appellant had no obvious injuries even though the victim appeared to have fought with his assailant. Appellant was indicted upon, and the jury was instructed upon, aiding and abetting. The jury may therefore have found appellant supported, assisted, encouraged, cooperated with, advised, or incited the beating death of Ernest Morris. Appellee's most compelling physical evidence was appellant's handprint on the outside of the truck, establishing appellant made contact with the vehicle in the time since it was returned to Morris earlier that day after being detailed.

{¶130}     Appellee filled in gaps in the physical evidence with the testimony of witnesses such as Remley, Ingram, and Nunemaker, whom appellant argues were not credible. We note, though, the three unwittingly corroborated each other. Nunemaker confirmed Dawn Remley was dropped off in front of the apartment. He also related compelling details of the night of the murder, including that someone named "Toby" could identify appellant, that the victim fell to the ground face-first, and that appellant disposed of the victim's distinctive orange cell phone. Nunemaker's testimony also confirmed the report of a fight between a woman matching the description of Jessica Bryant and a black male. He identified "Bishop" as a potential witness. He confirmed someone took the keys out of the truck and disposed of them. Finally, he drew a map of the crime scene containing relevant details.

{¶131}     The fact that the stories match each other in details that seemingly could not be known other than by the participants lend the testimony weight and credibility. The weight of the evidence and the credibility of the witnesses, though, are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-

2126, 767 N.E.2d 216, ¶ 79.  The jury could observe and listen to appellee's witnesses and evaluate their testimony accordingly.

{¶132}    In short, having thoroughly reviewed the record of this case, we find after viewing the evidence in a light most favorable to appellee, any rational trier of fact could have found the essential elements of murder and felonious assault proven beyond a reasonable doubt.  Additionally, we are unable to find the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be overturned and a new trial ordered.  We note the jury was able to weigh the evidence and inferences therefrom because appellant was found not guilty of aggravated robbery.

{¶133}    Appellant's ninth assignment of error is therefore overruled.

## CONCLUSION

{¶134}    Appellant's nine assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.

By:  Delaney, J. and

Farmer, P.J.

Gwin, J., concur.